UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. ROBERTS | CIVIL ACTION NO. 02-2199 |
| VERSUS | JUDGE ROBERT G. JAMES |
| AGING CARE HOME HEALTH, INC., ET AL. | MAG. JUDGE JAMES D. KIRK |

RULING

Before the Court is the United States' Motion for Partial Summary Judgment [Doc. No. 149].[1] The United States (hereinafter referred to as "the Government") claims that Defendants Aging Care Home Health, Inc. ("Aging Care") and its principals, Janice Davis ("Mrs. Davis") and Otis Davis ("Mr. Davis"), submitted false claims to the Medicare program in violation of the Stark Act, 42 U.S.C. § 1395nn (hereinafter referred to as "Stark II"), and, therefore, are liable for payment by mistake and unjust enrichment under federal common law.

Magistrate Judge James D. Kirk issued a Report and Recommendation [Doc. No. 191] recommending that the Court deny summary judgment because Stark II was not enforceable during the relevant time period. Instead, Magistrate Judge Kirk reasons that another regulation, 42 C.F.R. § 424.22, governs Defendants' conduct.

The Government filed an objection to the Report and Recommendation [Doc. No. 196] asserting that Defendants were required to comply with both Stark II and 42 C.F.R. § 424.22 during the relevant time period and that their violation of Stark II makes them liable for the

---

[1] This is a *qui tam* action brought by Relators Becky Roberts and Lori Purcell into which the United States intervened.

improper Medicare payments by mistake and unjust enrichment. Defendants filed a response [Doc. No. 198] concurring in Magistrate Judge Kirk's assessment.

For the following reasons, the Court DECLINES TO ADOPT the Report and Recommendation of the Magistrate Judge. The Government's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART.

I.  FACTS AND PROCEDURAL HISTORY

From September 1999 to November 2003, Aging Care, a home health services provider ("HHA"), compensated five physicians for performing advisory services.[2] [Doc. No. 149, Exhs. 8-13]. Pursuant to Aging Care's Physician Medical Service Agreements, the physicians agreed to review patients charts and plans of care, participate in regular meetings to review and discuss quality of care issues, and participate in training and evaluation of staff. [Doc. No. 149, Exhs. 1-7].

During the same time period, Aging Care billed the Medicare program and was reimbursed for services furnished to patients of these physicians. [Declaration of Special Agent Jeffrey M. Richards] ("hereinafter referred to as "Richards Decl.").[3] The Medicare program paid Aging Care $427,503.88 as a result of these claims. [Richards Decl., ¶ 11].[4]

---

[2]The physicians include Hayan Orfaly, Steven McMahan, Michael McCormick, John Coats, and Allen Spires.

[3]The Medicare program's computerized claims history shows each Aging Care claim submitted, the patient served, the date of service, and the name and identifying number of the patient's physician. [Richards Decl., ¶ 3]. Agent Richards declared that Aging Care billed the Medicare program and was reimbursed for services furnished to patients of these five physicians. [Richards Decl., ¶¶ 5-10].

[4]The Medicare program paid Aging Care $146,193.04 for services to Dr. Orfaly's patients from November 9, 1999 to July 7, 2000; $3,089.44 for services to Dr. McCormick's patients

On March 10, 2006, the Government filed a Motion for Partial Summary Judgment for payment by mistake and unjust enrichment. [Doc. No. 149].[5]

On April 3, 2006, Defendants filed a statement of contested material facts [Doc. No. 158] and a memorandum in opposition to the Government's Motion for Partial Summary Judgment [Doc. No. 159].

On April 21, 2006, the Government filed a reply [Doc. No. 169].

On October 5, 2006, Magistrate Judge Kirk held a hearing on the Government's Motion for Partial Summary Judgment [Doc. No. 187].

On October 30, 2006, Magistrate Judge Kirk issued a Report and Recommendation [Doc. No. 191] on the Government's Motion for Partial Summary Judgment.

On November 20, 2006, the Government filed an objection [Doc. No. 196] to the Report and Recommendation.

On November 30, 2006, Defendants filed a response [Doc. No. 198] to the Government's objection.

## II. LAW AND ANALYSIS

The Court reviews *de novo* a magistrate judge's report and recommendation if a party files specific, written objections within ten days of service. *See* 28 U.S.C. § 636(b)(1). In the

---

from February 27, 2000 to March 3, 2003; $3,777.25 for services to Dr. McMahan's patients from February 27, 2000 to March 3, 2003; $268,985.76 for services to Dr. Coat's patients from September 27, 1999 to March 3, 2003; and $5,548.39 for services to Dr. Spires' patients from June 18, 2001 to July 26, 2001. [Richards Decl., ¶¶ 6-10].

[5]The United States also alleges that Aging Care violated the False Claims Act, 31 U.S.C. §§ 3729-33, and Anti-Kickback Act, 42 U.S.C. §§ 1320a-7b(b), but did not move for summary judgment on those claims.

3

present case, both parties timely filed objections [Doc. Nos. 196 and 198] to the Magistrate Judge's Report and Recommendation, thus warranting *de novo* review by the Court.

For the reasons discussed below, the Court DECLINES TO ADOPT the Magistrate Judge's Report and Recommendation.

### A. Legal Framework

In 1982, Health and Human Services ("HHS) issued 42 C.F.R. § 424.22(d) pursuant to its authority under the Omnibus Reconciliation Act of 1980 [PL 96-499]. Section 424.22(d) restricts the financial relationship between a physician who certifies the need for home health services or establishes and reviews a plan of treatment and a HHA. Under § 424.22(d)(3), a HHA cannot bill the Medicare program if certifying physicians receive more than $25,000 or 5% of a HHA's operating expenses for the year, whichever is less.

In 1993, Congress amended the Medicare statute by the act known as Stark II. Stark II prohibits a HHA from billing the Medicare program, and the Medicare program from paying for services provided to patients who have been referred by physicians with whom the HHA has *any* financial relationship, unless an exception is met. *See* 42 U.S.C. § 1395nn(a)(1).

In 1997, HHS published a notice of intent to reconcile the limits on financial relationships in § 424.22(d) with Stark II. 62 Fed. Reg. 59818 (Nov. 5, 1997).

In 2001, final regulations for Stark II were published. 66 Fed. Reg. 856 (Jan. 4, 2001). The $25,000 limit in § 424.22(d) no longer exists. Section 424.22(d) now contains the same limits on financial relationships as Stark II.

### B. Magistrate Judge Kirk's Report and Recommendation

Magistrate Judge Kirk recommends denying the Government's Motion for Partial

Summary Judgment because Stark II was not enforceable until final regulations were published in 2001. Alternatively, Magistrate Judge Kirk reasons that § 424.22(d) constituted an exception to Stark II prior to 2001.

According to Magistrate Judge Kirk, § 424.22(d) was the only substantive regulation governing prohibited referrals until final regulations interpreting Stark II were published. In 1998, HHS stated that "it is confusing to have in effect two provisions that address prohibited referrals, each of which includes different criteria, and can lead to different results." 63 Fed. Reg. 1659, at 1679-1680 (Jan. 9, 1998). HHS further acknowledged that agency guidance in the form of "bright line" rules was needed to resolve this uncertainty. 66 Fed. Reg. 856, at 860 (Jan. 4, 2001). Therefore, Magistrate Judge Kirk concluded that it would be unfair to hold Defendants liable for violating Stark II when another confusing and contradictory regulation existed.

Alternatively, Magistrate Judge Kirk construes § 424.22(d) as an exception to Stark II. Stark II explicitly allowed HHS to promulgate *additional* exceptions, provided that the exception was ". . . specifie[d] in regulations [and] d[id] not pose a risk of program or patient abuse." 42 U.S.C. § 1395nn(b)(4). Because § 424.22(d) pre-dated Stark II and was not revoked following Stark II's enactment, Magistrate Judge Kirk concluded that it was reasonable for Defendants to assume they had complied with Stark II if physician compensation was less than $25,000 per year.[6]

The Government responds that Defendants were required to comply with § 424.22(d) *and*

---

[6]Magistrate Judge Kirk ultimately found there was a genuine issue of material fact whether Aging Care complied with the $25,000 limit.

Stark II.[7] The Government argues that Defendants had to comply with Stark II as of its effective date, January 1, 1995, regardless of when final regulations were published. Section 424.22(d) cannot be reasonably construed as an exception because it predated Stark II and would undermine legislative intent.

The Court finds that Defendants were required to simultaneously comply with § 424.22(d) and Stark II prior to 2001. Magistrate Judge Kirk offers no authority for his conclusion that Stark II was unenforceable prior to the issuance of final regulations in 2001. While Stark II and § 424.22(d) overlap, they are not mutually exclusive. HHS never expressly excused compliance with Stark II, and nothing in the statute or case law indicates that Stark II was not self-executing. Instead, courts evaluating pre-2001 Medicare payments have applied Stark II's statutory language explicitly prohibiting financial relationships except those meeting an express exception. *See, e.g., United States v. Rogan*, No. 02-3310, 2006 U.S. Dist. LEXIS 71215, at *48-54 (N.D. Ill. Sept. 29, 2006) (because Stark II's regulations cannot be applied retroactively, the district court applied Stark II's statutory language to pre-2001 Medicare payments).

Further, § 424.22(d) cannot be reasonably construed as an exception to Stark II. First, construing § 424.22(d) as an exception would circumvent legislative intent. HHS statements indicate that the more stringent requirements of Stark II were intended by Congress:

> We believe that the provisions we are developing under section 1877 [Stark II] are more effective than the current provisions in § 424.22(d) in accommodating Congress' desire to discourage physicians from overutilizing certain services. Furthermore, section 1877 [Stark II] relates more specifically and in greater detail to the issue of referrals for home health services by physicians who have a financial relationship with the entity providing

---

[7]The Government does not challenge whether Aging Care complied with § 424.22(d).

those services, and reflects Congress' most recent thoughts on that issue. 63 Fed. Reg. 1659, 1680 (Jan. 9, 1998). Second, to allow physician compensation, so long as the payments were less than $25,000 per year, would undermine Stark II's aim of limiting the corruptive influence of incentives from Medicare providers. *See, e.g., Rogan*, 2006 U.S. Dist. LEXIS 71215 at *52 n.10 (The defendant argued Stark II's remuneration exception was not enforceable until final regulations were issued. The district court reasoned that ". . . the Stark Statute, interpreted as [the defendant] argues, would fail to regulate the very abuses the statute was passed to prevent. . . **This would be contrary to the manifest purpose of the statute.**") (emphasis added). Third, when HHS did create regulatory exceptions to Stark II in 2001, the exceptions were clearly identified in the regulations as "exceptions" and referenced Stark II.

Therefore, the Court finds that Defendants were required to comply with Stark II prior to 2001. Accordingly, the Court DECLINES TO ADOPT the Report and Recommendation of the Magistrate Judge. The Court must now examine whether the Government is entitled to summary judgment under Stark II and federal common law.

    C.    **The Government's Motion for Partial Summary Judgment**

        1.    **Stark II**

The Government claims that Aging Care's financial relationship with five referring physicians violated Stark II. The uncontested evidence shows that Aging Care paid these physicians pursuant to compensation arrangements and the physicians signed patients' plans of care. Based on these facts, the Government argues that Aging Care violated Stark II by obtaining "referrals" from physicians with whom it had a financial relationship. [Doc. No. 149, Exhs. 1-13; [Richards Decl., ¶¶ 5-10].

Defendants claim that no physician has been charged with making a prohibited referral and that, until the Government establishes a Stark II violation against a physician pursuant to 42 U.S.C. § 1395nn(a)(1)(A), Defendants cannot be held liable for billing the Medicare program for a prohibited referral pursuant to 42 U.S.C. § 1395nn(a)(1)(B). Further, Defendants argue that the Government has not provided any proof that the claims at issue were "referred" by these physicians. Instead, the Government has only established that these physicians provided orders for admission of patients and signed the patients' plans of care.

Stark II prohibits a HHA from billing the Medicare program for services provided to patients referred by a physician with whom the HHA has a financial relationship, unless a specific exception is met. *See* 42 U.S.C. § 1395nn(a)(1)(B). A "financial relationship" includes remuneration to a physician under a compensation arrangement. *See* 42 U.S.C. § 1395nn(a)(2), (h)(1). A physician "referral" includes establishing a plan of care or certifying a patient for home health care. *See* 42 U.S.C. § 1395nn(h)(5)(B).

It is clear that Aging Care had "financial relationships" with the five "referring" physicians as defined by Stark II. Further, Defendants offer no legal authority showing that Stark II requires prosecution of referring physicians before prosecution of a HHA. Therefore, Aging Care is liable under Stark II unless its relationship with these physicians meets a statutory exception.

        **a.**    **Personal Service Arrangement Exception**

Of the statutory exceptions available, the Government contends that only the "personal service arrangement" exception has potential application to Medicare payments from 1999-2003. *See* 42 U.S.C. § 1395nn(e)(3). Under the personal service arrangement exception, a

compensation arrangement between a HHA and a referring physician must meet all of the following criteria:

 (i) the arrangement [must be] set out in writing, signed by the parties, and specif[y] the services covered by the arrangement,

 (ii) the arrangement [must] cove[r] all of the services to be provided by the physician (or an immediate family member of such physician) to the entity,

 (iii) the aggregate services contracted for [must] not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement,

 (iv) the term of the arrangement [must be] for at least 1 year,

 (v) the compensation to be paid over the term of the arrangement is set in advance, [must] not exceed fair market value, and except in the case of a physician incentive plan described in subparagraph (B), is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties,

 (vi) the services to be performed under the arrangement [must] not involve the counseling or promotion or a business arrangement or other activity that violates any State or Federal law, and

 (vii) the arrangement [must] meet such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(3)(A).

In this case, the Government argues that Aging Care's compensation agreements with the five physicians cannot meet the exception because they failed to specify the services actually performed, the physicians were compensated for performing unnecessary services at rates that exceeded fair market value, and the 1999 agreements failed to include terms of at least one year or more. [Exhs. 1-3].

The Government argues that the Court must look behind the terms of the formal arrangement and focus on the actual relationship between a physician and a HHA. *See United*

*States, ex rel Kaczmarczyk v. SCCI Heath Services Corp.*, Civ. No. H-99-1031, slip op. at 14-15 (S.D. Tex. Mar. 12, 2004). All five physicians testified that they did not perform the duties set forth in the compensation agreements.[8] Therefore, the agreements failed to specify the "services covered by the arrangement." 42 U.S.C. § 1395nn(e)(3)(A)(ii).

The Government also argues that the services paid for were not reasonably necessary, and, therefore, exceeded fair market value. Mrs. Davis testified that physicians were paid for being kept "up to date with things that [we]re going on at Aging Care," but admitted that these physicians were not "asked to offer anything" in return. [Davis II Deposition, pp. 27-28]. Some physicians testified that they were being paid to do little or nothing. Other physicians testified that they were being paid to provide standard services that they provided to all patients.[9]

Defendants respond that Aging Care did not pay for any unnecessary services. These agreements required physicians to perform specific services, including clinical record review, advisory board attendance, and agency policy and evaluation. The Medicare Conditions of Participation for Home Health Agencies require a participating HHA to have an advisory board that includes at least one physician. *See* 42 C.F.R. § 484.16. Therefore, these physicians were compensated for performing valid advisory services.

Finally, while Aging Care admits that the 1999-2001 agreements did not provide for a term of more than one year, the agreements were continuous and subject to a thirty (30) day cancellation notice. In 2002, Aging Care revised its contracts to specifically include a one year

---

[8] *See* Dr. Orfaly I Deposition, pp. 28-37; Dr. McMahan Deposition, pp. 26-33; Dr. McCormick Deposition, pp. 16-20, 31; Dr. Coats Deposition, pp. 21, 25, 37-39, 50-54; and Dr. Spires Deposition, pp. 31-34, 42-44.

[9] See text accompanying n.8, *supra*.

term.

While Defendants claim that these physicians were being paid to perform legitimate advisory functions, the only evidence they offer are the minutes of an October 19, 1999 meeting and the October 1999 and November 1999 "physician director/advisor documentation" records for Dr. Coats. [Doc. No. 158-2, Exhs. A, B, & C]. The minutes clearly indicate that none of the five referring physicians were present. Dr. Coats' records indicate that he performed clinical record reviews, agency policy reviews, agency education, and annual agency evaluations for approximately fifteen hours. However, Dr. Coats' 1999 agreement did not include a term of at least one year. [Doc. No. 149, Exh. 3]. Therefore, even if Dr. Coats substantially performed legitimate advisory services pursuant to his agreement with Aging Care in 1999, the agreement still fails to meet all of the requirements for the personal service arrangement exception.

The uncontested evidence shows that none of the arrangements satisfied the personal service arrangement exception. The physicians testified that they did not provide any legitimate advisory services as set forth in the agreements and were compensated for providing standard care to their patients or for doing nothing. The actual services performed were not specified in the agreement, not reasonably necessary, and exceeded fair market value. *See Rogan*, 2006 U.S. Dist. LEXIS 71215, at *81-81 (Because the contract at issue provided payments for services that were never substantially performed, the contract failed to satisfy the personal service arrangement exception to Stark II).

Because Aging Care's compensation arrangements with the five physicians fail to meet a statutory exception, the Court finds that Defendants violated Stark II by billing the Medicare program for services furnished pursuant to a prohibited referral.

### 2. Government's Entitlement to Recovery

Having determined that Defendants violated Stark II, the Court must now determine whether the Government is entitled to recovery under theories of payment by mistake or unjust enrichment.

### a. Payment by Mistake

The Government argues that the Medicare program would not have reimbursed Aging Care if it had known that the claims violated Stark II because statutory compliance is a condition of payment. *See* 42 U.S.C. § 1395nn(g)(1).

Defendants respond that Aging Care's 1999-2000 year-end cost reports were approved by Government auditors. Therefore, the Government was on notice and implicitly approved of Aging Care's compensation arrangements.

"The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 776 (N.D. Tex. 2003) (quoting *United States v. Wurts*, 303 U.S. 414, 415 (1938)). To prevail on a claim for payment by mistake (also known as payment by mistake-of-fact), the Government must show that the Medicare program "made. . . payments under an erroneous belief which was material to the decision to pay." *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970) (citing *Wurts*, 303 U.S. at 414).

While Defendants claim that government auditors approved their compensation arrangements, they offer no evidence to support their claim. Aging Care's 1999-2003 cost reports to the Medicare program each contained express and implied certifications of compliance with Stark II. [Doc. No. 149, Exh. 32; Doc. No. 30, Exhs. 3-7]. As these certifications were

false and material to the Medicare program's decision to pay, Aging Care was mistakenly paid. *See Rogan*, 2006 U.S. Dist. LEXIS 71215, at *84.

Therefore, the Government's Motion for Partial Summary Judgment for payment by mistake is GRANTED, and the Government is entitled to recover the amounts improperly paid to Aging Care.

### b. Unjust Enrichment

In the alternative, the Government claims that it is entitled to recovery under a theory of unjust enrichment. Otherwise, Aging Care would retain Medicare reimbursements to which it was not entitled. The Government also argues that Mrs. Davis is personally liable and was unjustly enriched by her annual salary of $150,000 and shareholder distributions of $309,800 in 2001 and $539,000 in 2002.[10]

Defendants respond that the Government has not established the requisite elements of unjust enrichment under Louisiana law. In Louisiana, to successfully invoke unjust enrichment, five prerequisites must be satisfied:

> (1) the defendant must receive an 'enrichment'; (2) the plaintiff must sustain an 'impoverishment'; (3) the enrichment and impoverishment must be connected; (4) no legal cause must justify the enrichment; and (5) the plaintiff must have no other legal remedy practically available and the impoverishment must not have been able to be reasonably avoided.

*Diggs v. Hood*, 772 F.2d 190, 193 (5th Cir. 1985). Defendants argue that the Government has not shown that Mrs. Davis' shareholder distributions are attributable to costs paid by the

---

[10] The Government claims that Mrs. Davis is personally liable because she signed the majority of the physician agreements and signed the 1999 certification to the Medicare program attesting that Aging Care's claims complied with applicable laws. While the Government named Mr. Davis as a defendant, it has not alleged how he is personally liable.

Medicare program. Defendants also argue that the Government has an adequate remedy at law because the Provider Agreements between Aging Care and the Medicare program constitute a contract for which there are various legal remedies available, such as breach of contract, administrative remedies under Stark II, criminal penalties and fines under the Anti-Kickback Act, and monetary damages under the False Claims Act.[11]

First, the Court finds that the remedies available arise under federal, not state, law. *United States v. Vernon Home Health*, 21 F.3d 693, 695 (5th Cir. 1994) ("[F]ederal law governs cases involving the rights of the United States arising under a nationwide federal program. . . ."). To prevail on a claim for unjust enrichment under federal common law, the Government must show: "(1) [it] had a reasonable expectation of payment, (2) [Defendants] should reasonably have expected to pay, or (3) 'society's reasonable expectations of person and property would be defeated by nonpayment.'" *Rogan*, 2006 U.S. Dist. LEXIS 71215, at *96 (citing *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 993-94 (4th Cir. 1990)).

Defendants received substantial Medicare reimbursements, totaling approximately $427,000, from their relationship with these physicians. Mrs. Davis also benefitted from her affiliation with Aging Care by drawing a generous salary. As a result, Defendants were unjustly enriched. *See, e.g., id.* ("As discussed above, Rogan received substantial financial benefits from his affiliation with Edgewater and entities, made through their management contracts with Edgewater, which were owned and controlled by Rogan; as a result, Rogan was unjustly enriched.").

---

[11]It is unclear whether Defendants claim that the Government's payment by mistake claim is also barred.

While Defendants claim that the Government has alternative legal remedies available, they have not shown how these remedies are adequate and thus preclude equitable relief. *See United States ex rel. Zissler v. Regents of Univ. of Minn.*, 992 F. Supp. 1097, 1113 (D. Minn. 1998) (Defendant failed to show that the legal remedies available to the government were adequate). Breach of contract is not available because Medicare Provider Agreements create statutory, not contractual, rights. *See, e.g., Maximum Care Home Health Agency v. HCFFA*, No. 97-1451, 1998 WL 901642, at *5 (N.D. Tex. Apr. 14, 1998) ("[A] Medicare service provider agreement is not a contract in the traditional sense. It is a statutory entitlement created by the Medicare Act."). A showing of wrongful conduct, such as knowingly submitting a false claim, is required to establish guilt under the Anti-Kickback Act or liability under the False Claims Act; under Stark II, ". . . the United States is not required to pursue an administrative action before seeking an overpayment action under theories of unjust enrichment or payment by mistake." *Medica-Rents Co.*, 285 F. Supp. 2d at 776. Further, HHS statements indicate that the primary remedy for a Stark II violation is nonpayment or recoupment of overpayments. *See* 66 Fed. Reg. 856, at 850-60 (Jan. 4, 2001).[12] Judicial economy and legislative intent would not be served by requiring the Government to pursue its legal remedies.

Therefore, the Government's Motion for Partial Summary Judgment for unjust enrichment is GRANTED, and the Government is entitled to recover the amounts improperly

---

[12]"While the HHS's position is official, in that it is posted on the HHS web site . . . it is not a regulation or other agency action entitled to judicial deference under the Chevron doctrine. However, the HHS's official position holds persuasive authority." *See, e.g., Liu v. Aventis Pasteur, Inc.*, 219 F. Supp. 2d 762, 767 n.4 (W.D. Tex. 2002); *see also Benasco v. Am. Home Prods.*, No. 02-3577, 2003 U.S. Dist. LEXIS 16492, at *7 n.1 (E.D. La. Sept. 9, 2003).

paid to Aging Care.

**D.     Damages**

Under a theory of unjust enrichment or payment by mistake, the Government is entitled to recover the value of the claims Aging Care submitted in violation of Stark II, totaling $427,503.88.  *See* Richards Decl. ¶ 11[13]; *see also Rogan*, 2006 U.S. Dist. LEXIS 71215, at *97 (reimbursing the government for the amount of improper Medicare payments).  The Government also requests pre-judgment interest from the date of the last improper payment to each physician until the date of judgment and post-judgment interest computed daily and compounded annually until the Government is paid in full.

A district court may award pre-judgment interest if the federal act creating the cause of action does not preclude pre-judgment interest.  *See Carpenters Dist. Council v. Dillard Dep't Stores*, 15 F.3d 1275, 1288 (5th Cir. 1994).  However, an award of pre-judgment interest is within the district court's discretion:

> Particular circumstances will justify a district court's denial of prejudgment interest, chief among these being a plaintiff's responsibility for 'undue delay in prosecuting the lawsuit.' Other circumstances may appropriately be invoked as warranted by the facts of particular cases.

*Jauch v. Nautical Servs.,* 470 F.3d 207, 215 (5th Cir. 2006) (internal citations omitted).

The Government has not alleged that the Medicare statute requires nor precludes an award of pre-judgment interest.[14]  Therefore, an award of pre-judgment interest is within the

---

[13]*See* text accompanying n.4, *supra*.

[14]The Government claims that pre-judgment interest is required in the Fifth Circuit. However, the cases cited do not involve the Medicare statute nor are they otherwise on point.

16

Court's discretion.  The Government delayed almost eighteen months in deciding whether to intervene in this action.  This case has involved the filing of almost 200 pleadings and motions from the initial date of filing in October of 2002 until the date of this judgment.  Given the complex legal issues involved and lengthy duration of the pretrial proceedings, the Court declines to award pre-judgment interest.  However, the Government is entitled to post-judgment interest under 28 U.S.C. § 1961(a) computed daily and compounded annually until the Government is paid in full.[15]

### III.     CONCLUSION

For the foregoing reasons, the Court DECLINES TO ADOPT the Report and Recommendation of the Magistrate Judge [Doc. No. 191].  The Government's Motion for Partial Summary Judgment [Doc. No. 149] is GRANTED IN PART AND DENIED IN PART.  The Government's Motion for Partial Summary Judgment is GRANTED to the extent that the Court finds Defendants violated Stark II and are liable to the Government under theories of payment by mistake and unjust enrichment.  Defendants are ORDERED to pay $427,503.88 with post-judgment interest at the legal rate set by 28 U.S.C. § 1961(a) computed daily and compounded annually until the Government is paid in full.  However, the Government's Motion for Partial Summary Judgment for pre-judgment interest is DENIED.

---

[15] "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[.] [sic] the date of the judgment."  28 U.S.C. § 1961(a).

MONROE, LOUISIANA, this 16th day of February, 2007.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE