RECEIVED
IN MONROE, LA

DEC 18 2007

ROBERT H. SHUMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. ROBERTS | CIVIL ACTION NO. 02-2199 |
| VERSUS | JUDGE ROBERT G. JAMES |
| AGING CARE HOME HEALTH, INC., ET AL. | MAG. JUDGE JAMES D. KIRK |

### RULING

Before the Court is the United States' "Motion for Partial Summary Judgment against Aging Care and Janice Davis on Count I (False Claims Act: Presentation of False Claims) (31 U.S.C. § 3729(a)(1), Count II (False Claims Act: Making or Using False Record or Statement to Cause Claim to Be Paid) (31 U.S.C. § 3729(a)(2)), and Count III (False Claims Act: Making or Using False Record or Statement to Avoid an Obligation to Refund) (31 U.S.C. § 3729(a)(7))" ("Second Motion for Partial Summary Judgment") [Doc. No. 224].

The United States (hereinafter referred to as "the Government") contends that Defendants Aging Care Home Health, Inc. ("Aging Care") and its principal, Janice Davis ("Mrs. Davis"), knowingly submitted false claims cost report certifications and claims for payment to the Medicare program. Likewise, the Government contends that Defendants failed to refund payments received from Medicare when they knew they were issued based upon false records or statements. The Government argues that Defendants' actions, previously found by the Court to violate the Stark Act, 42 U.S.C. § 1395nn (hereinafter referred to as "Stark II"), also violate the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.

1

Defendants have not opposed the Government's Second Motion for Partial Summary Judgment.

For the following reasons, the Government's Second Motion for Partial Summary Judgment is GRANTED.

## I.    FACTS AND PROCEDURAL HISTORY

From September 1999 to November 2003, Aging Care, a home health services provider ("HHA"), compensated five physicians for performing advisory services. [Doc. No. 149, Exhs. 8-13]. Pursuant to Aging Care's Physician Medical Service Agreements, the physicians agreed to review patients' charts and plans of care, participate in regular meetings to review and discuss quality of care issues, and participate in training and evaluation of staff. [Doc. No. 149, Exhs. 1-7].

During this same time period, Aging Care billed the Medicare program and was reimbursed for services furnished to patients of these physicians. [Declaration of Special Agent Jeffrey M. Richards] ("Richards Decl."). The Medicare program paid Aging Care $427,503.88 as a result of these claims. [Richards Decl., ¶ 11].

On March 10, 2006, the Government filed a Motion for Partial Summary Judgment for payment by mistake and unjust enrichment. [Doc. No. 149]; see also [Doc. No. 169 (Reply)]. Defendants opposed the Government's Motion for Partial Summary Judgment [Doc. Nos. 158 & 159].

On February 16, 2007, the Court issued a Memorandum Ruling [Doc. No. 199], declining to adopt the Report and Recommendation of the Magistrate Judge on the Government's Motion

for Partial Summary Judgment.  The Court ruled that Defendants Aging Care and Janice Davis[1]

violated Stark II and are liable to the Government under theories of payment by mistake and

unjust enrichment.  The Court ordered Defendants to pay $427,503.88 with post-judgment

interest at the legal rate set by 28 U.S.C. § 1961(a) computed daily and compounded annually

until the Government is paid in full.  The Court declined to award pre-judgment interest.

The Government now moves in this Second Motion for Partial Summary Judgment for a

finding that Defendants Aging Care and Janice Davis violated the FCA.  The Government

contends that the undisputed evidence shows that Defendants' violations of Stark II were made

"knowingly" and thus, also constituted violations of the FCA.

## II.    LAW AND ANALYSIS

### A.    Unopposed Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to

interrogatories and admissions on file, together with any affidavits, show that there are no

genuine issues as to any material fact and that the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of informing the

court of the basis for its motion by identifying portions of the record which highlight the absence

of genuine issues of material fact.  Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992).  A

fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit

under applicable law in the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

---

[1]The Government moved for summary judgment only against Aging Care and Janice Davis.  Mrs. Davis signed the physician agreements and also signed the 1999 certification to the Medicare program attesting that Aging Care's claims complied with applicable laws.  Although Otis Davis remains a defendant in this matter, the Government has never alleged how he is personally liable.

dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id. The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. Ashe v. Corley, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim." Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998).

A motion for summary judgment cannot be granted simply because there is no opposition, even if the failure to oppose it violates a local rule. Hibernia Nat'l Bank v. Administracion Central Sociedad Anonima, 776 F.2d 1277, 1279 (5th Cir. 1985). However, when a nonmovant fails to provide a response identifying the disputed issues of fact, the court may accept the movant's description of the undisputed facts as prima facie evidence of its entitlement to judgment. Eversley v. Mbank Dallas, 843 F.2d 172, 173-74 (5th Cir. 1999); NorDar Holdings, Inc. v. W. Sec. (USA) Ltd ., No. 3:96-CV-0427-H, 1996 WL 739019, *2 (N.D. Tex. Dec. 18, 1996).

## B. False Claims Act

The Government claims that Aging Care and Janice Davis violated the FCA by knowingly providing false claims, statements, and certifications of compliance with applicable

4

statutes, including Stark II, to Medicare.

The FCA, 31 U.S.C. § 3729, states in relevant part:

    (a)      Liability for certain acts.-Any person who-

            (1)      knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

            (2)      knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

            . . .

            (7)      knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

    is liable to the United States Government. . . .

31 U.S.C. § 3729(a)(1)-(2),(7).

The statute also defines key terms. "[T]he terms 'knowing' and 'knowingly' mean that a person, with respect to information . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

In order to prevail on its claims, the Government must demonstrate that Davis and Aging Care violated 31 U.S.C. § 3729(a)(1), (2), or (7). The Government must prove that (1) Defendants presented or caused to be presented[2] a claim to the federal government, **or**

---

[2]Defendant Aging Care, a corporation, can be held liable under the FCA for the actions of its employees and officers acting within the scope of their authority. United States v. Hangar One, Inc., 563 F.2d 1155, 1158 (5th Cir.1977) (holding that a corporation may be vicariously

Defendants made, used, or caused to be used a record or statement to get a claim paid or

approved by the federal government, **or** Defendants made, used, or caused to be used or made a

record or statement or the claim to conceal, avoid, or decrease an obligation to pay or transmit

money to the federal government[3]; (2) the claim, record, or statement was false or fradulent; (3)

Defendants knew the claim, record, or statement was false or fraudulent; and (4) whatever makes

the claim, record, or statement false or fraudulent is material to the defendant's entitlement to

receive payment from or avoid payment to the Government. See 31 U.S.C. § 3729(a); United

States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir.1997)

("FCA interdicts material misrepresentations made to qualify for government privileges or

services."); United States v. Southland Management Corp., 326 F.3d 669, 679 (5th Cir. 2003) (en

banc) ("there should no longer be any doubt that materiality is an element of a civil False Claims

Act case") (Jones, J., concurring) (citing Thompson, 125 F.3d at 902); Southland Management,

326 F.3d at 676-77("While this court has indicated that the [FCA] contains a materiality element,

---

liable under the FCA for the conduct of employees "acting within the scope of their authority and
for the purpose of benefitting the corporation," even if the employees lacked "substantial
authority and broad responsibility."). Notably, there is some question whether the employee's
actions must benefit the corporation for FCA liability to attach, but the Court need not consider
this issue because the actions taken by Davis and others were clearly for the financial benefit of
Aging Care. See American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S.
556 (1982) (holding an association liable for treble damages under the Sherman Act for the
unauthorized actions of one of its agents, even though those actions did not benefit the
association, but were taken to benefit the agent's outside financial interests).

[3]Although the Fifth Circuit has not addressed this issue, some courts have found that the
Government need not prove a defendant "presented" a reverse false claim under §3729(a)(7).
See United States ex rel Ward v. Commercial Metals Co., C.A. No. C-05-56, 2007 WL 1390612,
at *1 n.1 (S.D. Tex., May 9, 2007). However, in this case, the Government relies only on claims
actually presented to Medicare.

we have not yet clarified the exact nature of this requirement.").

This Court has previously found that Defendants violated Stark II[4] by billing the Medicare program for services furnished pursuant to a prohibited referral to five physicians.[5] Specifically, the Court found that five cost report certifications for the years 1999-2003 that Aging Care submitted to Medicare for the five physicians violated Stark II and were "false and material to the Medicare program's decision to pay . . ." 615 claims [Doc. No. 199, pp. 12-13].[6] Medicare conditions payment of a claim upon a claimant's certification of compliance with the Stark laws. See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F.Supp.2d 1017, 1042 (S.D. Tex. 1998) ("The cost report and certification process is a self-policing mechanism that is critical to the national effort to prevent and remedy fraud and abuse in the public health care financing system, [including Medicare,] since the government can

---

[4]Violations of Stark II or any other law, without more, do not create liability under the FCA. Thompson, 125 F.3d at 902 ("[V]iolations of law, rules, or regulations alone do not create a cause of action under the FCA.") (quoting United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir.1996)).

[5]The physicians include Hayan Orfaly, Steven McMahan, Michael McCormick, John Coats, and Allen Spires.

[6]The Fifth Cicuit has explained Stark II as follows:

Stark II became effective January 1, 1995, and prohibits physicians from referring Medicare patients to an entity for certain "designated health services," including inpatient and outpatient hospital services, if the referring physician has a nonexempt "financial relationship" with such entity. 42 U.S.C. § 1395nn(a)(1), (h)(6). Like its predecessor, Stark II provides that the entity may not present or cause to be presented a Medicare claim for services furnished pursuant to a prohibited referral, and expressly prohibits payment of Medicare claims for services rendered in violation of its provisions. 42 U.S.C. § 1395nn(a)(1), (g)(1).

Thompson, 125 F.3d at 902.

review only a small fraction of the claims submitted and therefore must rely on them."); see also

United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243 (3rd Cir. 2004) ("A certificate

of compliance with federal health care law is a prerequisite to eligibility under the Medicare

program.") (citing 42 C.F.R. § 413.24(f)(4)(iv); Thompson, 125 F.3d at 902).  Therefore,

Defendants both presented a false or fraudulent claim for payment and relied on a false or

fraudulent statement or record to obtain payment from Medicare.  Similarly, once Defendants

obtained payment from Medicare for services "performed under a prohibited referral," they failed

to "refund all collected amounts on a timely basis."  42 C.F.R. § 411.353.

Given these findings, the Court need only address the scienter requirement of the FCA.

Having reviewed the extensive exhibits and the testimony in this matter, which now stand

undisputed, the Court finds that Defendants had sufficient knowledge or reckless disregard of the

truth to warrant their liability under the FCA as a matter of law.

The Government has presented evidence that Davis, on behalf of Aging Care, sent a letter

detailing the statutory requirements of Stark to Dr. Allen Herbert, another Advisory Board

physician, in 1997, two years before the unlawful conduct in this case.  [Doc. No. 224, Exh. B].

She specifically told Dr. Herbert that he "could only [be] compensated for those duties spelled

out in the Physician's Service Agreement."  Yet, Davis admitted in her 2002 deposition that none

of the Advisory Board physicians were "asked to offer anything" in return for their payments.

[Doc. No. 224, Exh. A, pp. 27-28].

The Government presented testimony from Advisory Board physicians to further support

its contention that Davis and Aging Care acted with actual knowledge that they were violating

the Stark laws, willful ignorance to the laws, or, at the very least, with reckless disregard for the

laws. For example, another Advisory Board physician, Dr. Orfaly, testified that Davis personally

told him that his payments would not be tied to his contractual duties, but to the time he spent

caring for his patients through plan oversight. [Doc. No. 224, Exh. C, pp. 29-30]. He further

testified that Davis "masked" his payments by creating a contract listing duties he never

performed nor was ever asked to perform. [Doc. No. 224, Exh. C, pp. 36-37]. Dr. Orfaly and Dr.

Alyce Adams, another Advisory Board physician, were paid based on a computerized physician

service log, which tracked the time the doctors spent caring for their own patients, not on

contractual duties. Evidence was presented that the computer program was prepared by Wayne

Colvin, a former Aging Care employee, and approved by Davis.[7] The physicians testified that

payment for the patient care duties they were already performing was unnecessary and

inappropriate.

Other physicians, such as Dr. McMahan and Dr. McCormick, testified that they were not

performing contractual duties and told representatives of Aging Care that they were not. Thus,

they received payment for doing nothing at all.

Although Defendants failed to respond to the Government's Second Motion for Partial

Summary Judgment, they did respond to the Government's previous Motion for Partial Summary

Judgment. In their response, they disputed some of the evidence relied upon in this motion.

Ruling on the Government's first Motion for Partial Summary Judgment, the Court stated as

follows:

---

[7]Colvin testified that he and the Davises met with a Medicare consultant who raised concerns about costs at the Ruston office. As a result, Colvin devised a computer log spreadsheet to track the time then-Advisory Board member, Dr. Herbert, allegedly spent performing careplan oversight. Dr. Herbert's time was then multiplied by the rate of $50 per hour. [Doc. No. Exh. H, pp. 43-52).

While Defendants claim that these physicians were being paid to perform legitimate advisory functions, the only evidence they offer are the minutes of an October 19, 1999 meeting and the October 1999 and November 1999 "physician director/advisor documentation" records for Dr. Coats. [Doc. No. 158-2, Exhs. A, B, & C]. The minutes clearly indicate that none of the five referring physicians were present. Dr. Coats' records indicate that he performed clinical record reviews, agency policy reviews, agency education, and annual agency evaluations for approximately fifteen hours. However, Dr. Coats' 1999 agreement did not include a term of at least one year. [Doc. No. 149, Exh. 3]. Therefore, even if Dr. Coats substantially performed legitimate advisory services pursuant to his agreement with Aging Care in 1999, the agreement still fails to meet all of the requirements for the personal service arrangement exception.

[Doc. No. 199, p. 11].

Further, as pointed out by the Government in the current motion, like Dr. McMahan and Dr. McCormick, Dr. Coats admitted in his deposition that he was **not** performing his contractual duties and that he informed Aging Care representatives that he was not performing his duties.

The Government further presented the deposition testimony of former marketers for Aging Care, Hollie Porter and Lee Sebren Walters. Both testified that they were required to obtain handwritten Physician Service Logs signed by each physician, which were compilations of the duties the physician had performed for his Aging Care patients. The logs directly track prohibited payments made to the physicians for patient care, not for their Advisory Board duties. Porter and Walters testified that Davis or her assistant, Tara Howington, received the logs, and that Davis made statements to them indicating her knowledge of the improper use of the logs.

Finally, the Government has presented evidence that Davis engaged in conduct between 2003 and 2007 designed to conceal Aging Care's prohibited payments to its Advisory Board physicians. In the summer of 2003, Inspector General of the Department of Health and Human Services issued a subpoena and discovery requests to Aging Care and Davis. According to the

10

testimony of former Aging Care marketers, Tommie Nolan and Paige Ensminger created false timesheets (or Physician Director/Advisor Documentation Records) in response to the subpoena, in order to mask the actual nature of the payments and tie them to legitimate contractual duties. Davis also lied about the existence of and failed to produce any handwritten or computer-generated Physician Service Logs in response to the discovery requests.  Davis prepared a statement delivered by her attorney to Special Agent Jeff Richards, accusing the Relators in the matter, Becky Roberts and Lori Purcell of creating "the phony 'physician service logs.'" [Doc. No. 224, Richards Declaration III].

Likewise, in 2005, Davis again lied in discovery responses in this lawsuit, continuing to deny that the Physician Service Logs existed or that she could produce them.  The Government later obtained these supposedly non-existent logs from the Bankruptcy Trustee's office in Natchitoches, Louisiana.

Davis' fradulent conduct culminated at her deposition on August 9, 2007.  When confronted with questions at her deposition, Davis invoked her Fifth Amendment right against self-incrimination, she answering only 3 of the 167 questions posed to her. While Davis had a right to seek constitutional protection, the Court reaches an adverse inference based on the invocation of that right and the other evidence presented. See Curtis v. M & S Petroleum, Inc., 174 F.3d 661, 673-74 (5th Cir. 1999) (The Fifth Circuit has "held that while a person may refuse to testify during civil proceedings on the grounds that his testimony might incriminate him, his refusal to testify may be used against him in a civil suit.").

The facts about Davis' conduct in attempting to conceal prohibited payments to physicians were not presented to the Court with regard to the Government's first Motion for

Partial Summary Judgment, and Defendants have failed to offer any evidence to the contrary in response to the pending motion. Therefore, the Court accepts as a matter law the facts as presented by the Government.

Based upon this evidence and testimony and the other evidence presented by the Government in support of its second Motion for Partial Summary Judgment[8], the Court finds that Davis and Aging Care acted with knowledge that they were violating the Stark laws with regard to their payments to Advisory Board physicians, their presentation of claims to Medicare, and their failure to refund Medicare amounts received. Accordingly, there is no genuine issue of material fact for trial, and the Government is entitled to summary judgment on its claim that Defendants violated the FCA.[9]

## C.  Remedies

Having determined that the Government prevails, the Court is required by the FCA to award treble damages and a fine of not less than $5,500 nor more than $11,000 per claim. See 31 U.S.C. § 3729(a); 28 U.S.C. § 2461 (amending 31 U.S.C. § 3729(a) to permit the increase of the fines by regulation); 64 Fed. Reg. 47099, 47104 (1999) (increasing the minimum fine from $5,000 to $5,500 and the maximum fine from $10,000 to $11,000 for violations occurring after September 29, 1999); see also United States v. Texas Tech Univ., 171 F.3d 279, 282 n.2 (5th Cir.

---

[8]While the Court has recounted certain evidence it found particularly compelling in this case, the Government's memorandum recounts abundant other testimony from former employees and physicians which showed that Davis and Aging Care, through Davis and other employees, had the requisite scienter under the FCA.

[9]While the Government has focused on the Stark laws in its motions for summary judgment, its original Complaint also raised violations of the Anti-Kickback Statute, 42 U.S.C.§§ 1320a-7b(b), which also appears to have been violated.

12

1999) (The relator sought to "collect a Texas-sized reward based on her allegations of over 400,000 false claims (which could generate fines of between $5,000 and $10,000 **each**) and over $20 million in overpayments (which § 3729(a) would treble))." (emphasis added). The Government also requests post-judgment interest computed daily and compounded annually until the Government is paid in full.

The Court has previously determined the Government's damages to be $427,503.88. Thus, the United States is entitled to recover three times its single damages, a total award of $1,282,511.64. 31 U.S.C. § 3729(a). Defendants shall be ordered to pay this amount jointly and severally. See Mortgages, Inc. v. U.S. District Court, 934 F.2d 209 (8th Cir. 1991) (citing United States v. Aerodex, 469 F.2d 1003, 1012 (5th Cir. 1972); see also United States of America v. Century Health Services, 136 F. Supp.2d 876, 895 (M.D. Tenn. 2000) (corporate officers are liable in their individual capacities under the FCA if they knowingly or with reckless disregard make false claims for payment on behalf of the corporation).

Given the large amount of damages in this case, the evidence presented, and the totality of the circumstances, the Court imposes a fine of $5,500 for each false claim contained in the 615 claims for payment and the five false cost certification reports submitted for a total fine of $3,410,000.00.

The Government is entitled to post-judgment interest under 28 U.S.C. § 1961(a) computed daily and compounded annually until the Government is paid in full on the total amount of $4,692,511.60.[10]

---

[10]"Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the

## III.    CONCLUSION

For the foregoing reasons, the Court GRANTS the Government's Second Motion for

Partial Summary Judgment [Doc. No. 224].  Judgment is entered in favor of the Government and

against Defendants in the amount of $1,282,511.60 in damages and $3,410,000.00 in fines, for a

total of $4,692,511.64.

MONROE, LOUISIANA, this ___17___ day of ___December___, 2007.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

judgment."  28 U.S.C. § 1961(a).